UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

LILIBETH G.,                                                :
          Plaintiff,                           :
                                  :
          v.                                   :        C.A. No. 20-474WES
                                  :
KILOLO KIJAKAZI,                                     :
Acting Commissioner of Social Security,              :
          Defendant.                          :

**REPORT AND RECOMMENDATION**

PATRICIA A. SULLIVAN, United States Magistrate Judge.

As a child of seventeen, with the assistance of an attorney, Plaintiff Lilibeth G. was found eligible for Supplemental Security Income ("SSI") disability benefits based on severe depressive/anxiety disorders, an eating disorder and attention deficit/hyperactivity disorder ("ADHD"). Tr. 81, 87-88. When she turned eighteen in late September 2017, Plaintiff's eligibility was required to be redetermined ("Age-18-Redetermination"), this time based on the rules for determining disability that are appliable to adults. Tr. 17, 19. Following three[1] hearings at which Plaintiff appeared *pro se*,[2] an administrative law judge ("ALJ") denied her claim. Although the ALJ found that depression, anxiety and eating disorders continue to be severe, she discounted Plaintiff's subjective statements about their impact on her ability to function and relied instead on the administrative findings of two non-examining expert psychologists, particularly Dr. Clifford Gordon, as well as on her own examination of the record, resulting *inter alia* in the finding that the post-file-review record is consistent with the prior record and does not indicate worsening or the development of a new condition. Tr. 19, 26. The ALJ concluded that

---

[1] The first hearing was before a hearing officer, while the second and third were before an administrative law judge.

[2] Plaintiff is no longer *pro se*. She engaged counsel shortly after the ALJ's adverse decision issued. Tr. 13.

the functional limitations that Plaintiff's impairments cause are no more than moderate and fashioned a consistent mental residual functional capacity ("RFC").[3]  In reliance on a vocational expert, the ALJ found there are jobs in the national economy that Plaintiff can perform and concluded that her disability ended on January 22, 2018, and that she has not been disabled since that date.  Tr. 27.  After the Appeals Council denied review, Plaintiff filed her appeal of this denial of SSI benefits pursuant to § 1631(c)(3) of the Social Security Act (the "Act"), 42 U.S.C. §§ 405(g), 1383(c)(3).

In her motion for reversal and remand, ECF No. 12, Plaintiff challenges the ALJ's decision arguing that its focus is improperly limited to medical evidence after January 2018; that the ALJ cherry-picked the evidence that she did consider by focusing on Plaintiff's largely normal mental status examination ("MSE")[4] results, conservative treatments and gaps in treatment; that the ALJ improperly interpreted raw medical data; that the ALJ erred in finding Plaintiff's statements about her symptoms not credible; and that the ALJ did not afford Plaintiff a fair hearing despite her *pro se* status.  The counter motion of the Acting Commissioner of Social Security ("Commissioner"), ECF No. 15, argues that the ALJ's hearing was conducted fairly and her decision is consistent with applicable law and appropriately rests on substantial evidence; he asks that it be affirmed.  The motions have been referred to me for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

---

[3] "RFC" or "residual functional capacity" is "the most you can still do despite your limitations," taking into account "[y]our impairment(s), and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect what you can do in a work setting."  20 C.F.R. § 416.945(a)(1).

[4] The mental status examination or MSE is an objective clinical assessment of an individual's mental ability, based on a health professional's personal observation, where "experienced clinicians attend to detail and subtlety in behavior, such as the affect accompanying thought or ideas, the significance of gesture or mannerism, and the unspoken message of conversation."  Velazquez v. Astrue, No. CA 11-535S, 2013 WL 1415657, at *2, n.4, and see *13 n. 6 (D.R.I. Feb. 22, 2013), adopted sub nom. Velazquez v. Colvin, 2013 WL 1415586 (D.R.I. Apr. 8, 2013).

I.      **Background**

Following verbal bullying at school when she was thirteen, Plaintiff developed a severe eating disorder, as well as depression and anxiety disorders, resulting in self-injurious conduct such as cutting herself.  Tr. 608.  At fourteen she was psychiatrically hospitalized for anorexia and began treatment for the eating disorder with Dr. Abigail Donaldson and a team at Lifespan's Hasbro Hospital.  Tr. 370, 372.  Despite these difficulties, her prognosis was not dire; when she was sixteen, her primary care physician at Santiago Medical Group, Dr. Teresa Jeraldo, opined that "[h]er prognosis is fairly good depending how she matures, if she continues taking her medications & attends her counseling sessions."  Tr. 381.

In September 2015, Plaintiff applied for SSI as a child, alleging onset of disability in 2013.[5]  Tr. 70.  At the initial phase, her claim was denied based on medical evidence establishing that her weight had stabilized, and the cutting behavior had decreased, although her frequent school refusals were found to evidence marked social limitations.  Tr. 74-76.  On reconsideration, with additional evidence of a psychiatric hospital admission, teacher reports and ongoing eating issues, a second non-examining psychologist found that Plaintiff also had marked limits in caring for herself, yielding the finding of disability with onset as of September 2015. Tr. 88.

According to the ALJ, Plaintiff turned eighteen on September 28, 2017;[6] this triggered the mandatory Age-18-Redetermination based on the disability rules applicable to adults.[7]

---

[5] The records reflect that Plaintiff was represented by counsel during this application process.  Tr. 69, 81.

[6] There is some confusion in the record regarding the precise date of Plaintiff's birthday.  Compare Tr. 19 (birthday is September 28), with Tr. 92 (birthday is September 29), and Tr. 196 (birthday is September 30).  These discrepancies are not material.

[7] Despite having had a lawyer during the 2015-2016 application, Plaintiff appears to have been *pro se* throughout the Age-18-Redetermination process, until after the ALJ's adverse decision issued on July 26, 2019.

Meanwhile, in the lead up to her birthday, during the summer of 2017, treating sources noted that Plaintiff's mood was improving, self-injury was reduced, and she was engaged in social activities out of the home such as going "to Six Flags and walk[ing] around more with friends" and getting "Chinese food . . . at the mall."  Tr. 552, 578; see Tr. 592, 594 (Dr. Solberg's June and August 2017 MSE findings largely normal, including appearance, attitude, motor activity, thought, speech and perception; only abnormal findings were anxious mood and affect and fair concentration, insight and judgment).  The treating records in the first months of 2018 are similarly sparse and even more benign.  For example, when Plaintiff saw Dr. Jeraldo in April 2018 for abdominal pain caused by eating too much junk food, she reported having left her medication at a boyfriend's house.  Tr. 620.  Part of Plaintiff's treatment lapse during this period appears to be due to the lack of insurance – in October 2018, Plaintiff told her treating providers at Lifespan (Dr. Donaldson and Dr. Andrew Fukada) that the hiatus of over a year since she had last been to their clinic was due to her loss of insurance when she turned eighteen in September 2017, and that she did not acquire new insurance until shortly before her October 2018 appointment.  Tr. 636.  During the fall of 2017, Plaintiff continued to have mental health appointments with a therapist at Wellness RI (Ms. Janet Cohen), but Ms. Cohen reported that Plaintiff attended only one session and "failed to show up for any other scheduled appointments"; the record does not reveal whether Plaintiff's failure to appear was caused by the loss of insurance.  Tr. 589.  A consulting examination performed in January 2018 by an expert psychologist, Dr. Sol Pittenger, reflects a relatively benign MSE, except for depressed and anxious mood with fair judgment and fair-to-poor insight.  Tr. 607, 610-11.

In January 2018, the record as of that date was reviewed initially by a non-examining psychologist, Dr. Albert Hamel.  Dr. Hamel found that Plaintiff's functioning had been stable

since April 2017, and that, while her anxiety, depressive and eating disorders were all severe, they caused no more than moderate limits.  Noting the absence of any medical source opining to functional limitations, Dr. Hamel focused on the clinical observations in Dr. Pittenger's report and in the treating records to find Plaintiff moderately limited due to depression and anxiety in concentration, pace and persistence, as well as in interacting with others.  In May 2018, a second non-examining psychologist, Dr. Clifford Gordon, reexamined the entire file as of that date, including the records Dr. Hamel had not seen.  Dr. Gordon endorsed Dr. Hamel's PRT and RFC assessment of moderate limitations.  Tr. 614.

On June 5, 2018, Plaintiff appeared *pro se* with her mother before a disability hearing officer.  She testified to her difficulties in being around people, her depression, her struggle with the urge to cut herself, her decision to drop out of high school, and her failed attempt to work as a cashier at BJs, while her mother described her daughter as having only a few friends, sometimes sleeping all day, and being more irritable.  Tr. 115-17.  The hearing officer noted Plaintiff's serious 2016 history, but her relative stability since April 2017, coupled with the paucity of treating records; regarding the latter concern, the hearing officer questioned Plaintiff and her mother, focusing on the lack of mental health treatment other than medication prescribed by the primary care physician.  Tr. 118.  In an attempt to develop the record further based on Plaintiff's mother's representation that Plaintiff would soon attend a scheduled mental health appointment, the hearing officer advised Plaintiff and her mother that the record would be held open to receive the treating record.  Tr. 118.  Yet, no further records were submitted.  After waiting and receiving nothing, the hearing officer issued her detailed (and unchallenged) decision, finding a lack of "objective credible evidence to support her allegations," and that

Plaintiff was "capable of performing tasks that are non-complex and do not require interaction with the general public." Id. 118-21.

During the balance of 2018 and in the first half of 2019, Plaintiff continued to receive treatment.  In October 2018, Dr. Fukuda opined to "normal mental status" and that "Pt does not pose danger to self or others, nor does she exhibit grave functional disability"; he urged her to address her mental health impairments through outpatient management.  Tr. 638.  In November 2018, Plaintiff was seen at Rhode Island Hospital for vomiting after eating at Taco Bell with friends.  Tr. 648.  When she stated that she had not seen a psychiatrist or a psychologist in over a year, she was given a referral to a social worker, who opined that she "completes ADLs independently," and made normal MSE observations, including that she has a "strong support system," with "two close friends who are supportive," and her "biggest support is her boyfriend (30-yo; she often spends multiple days in a row at his house and . . . feels safe and comfortable with him)."  Tr. 634-35.  In February 2019, Plaintiff had a psychological evaluation at intake with Psychiatric-Mental Health Nurse Practitioner Samuel Kaufman of Wellness RI.  Tr. 627-30.  Nurse Kaufman's MSE observations were entirely normal.  Tr. 630.  He noted that Plaintiff "seems to have lots of things she wants to do and could be interested in like going to the gym and getting her GED but has excuses like doesn't have a car or wants to go with a friend."  Tr. 628.  Otherwise, Plaintiff canceled or failed to appear for most of her mental health treating appointments at Wellness RI during the second half of 2018 through June of 2019.  Tr. 662; see Tr. 697 (as of May 2019, Plaintiff at risk of being dropped by practice due to failures to appear for appointments).  The few times she did appear yielded entirely normal MSE observations, except for fair insight and judgment.  See e.g., Tr. 669.

The last MSE of record is recorded by Dr. Andrews, with input from Plaintiff's long-time physician (since age fourteen), Dr. Donaldson.  It is entirely normal ("comfortably sitting in chair, intermittently smiling, answers questions cooperatively and appropriately"), except for "limited" insight and judgment.  Tr. 700-01.  Importantly, Dr. Andrews also encouraged Plaintiff to work and attend the appointments that she had been skipping:

> Reviewed at length the role that a routine/structure to the day/week will play in her getting traction in treatment for both her ED and also for her low mood.  She is about to start work, which may help, and also encouraged her to plan ahead and make sure she gets to her therapy/medication management appointments.  This will serve the dual purpose of supporting her mental health, while also imposing some structure.

Tr. 701.

Meanwhile, following the second administrative denial by the hearing officer, Plaintiff's claim moved to a new phase – the hearing before the ALJ.  The ALJ's first attempt to have a hearing was on February 25, 2019, at which a vocational expert appeared prepared to testify. Despite having received ample material (sent to Plaintiff and her mother) advising her of her right to counsel, including information to assist her in engaging counsel, Tr. 136-40, 143-45, Plaintiff appeared *pro se* without her mother but told the ALJ that she wanted legal counsel.  Tr. 64.  In response, the ALJ appears to have been patient and helpful, reading the postponement letter aloud to Plaintiff, arranging to have Plaintiff provided with a list of organizations that provide services, and counseling Plaintiff on the importance of seeking an attorney quickly so that she could have one for the rescheduled hearing.  Tr. 65, 67.  The ALJ also questioned Plaintiff about her medical treatment and any employment attempts to be sure the record was complete.  Tr. 66-67.

On June 3, 2019, the ALJ convened the second hearing, again with a vocational expert. Again Plaintiff came alone, still *pro se*.  Tr. 45.  This time, she told the ALJ that the hearing

could proceed.  Tr. 46.  During the second hearing, Plaintiff testified that she fears going out in public, stays in her room and that her mother has had to stay home to care for her, although she subsequently admitted that her mother is at home due to her own disability from a stroke and other health issues.   Tr. 48-50.  Plaintiff became tearful when she testified that she has no friends ("I don't have any friends") except her mother, Tr. 52, testimony that is directly contradicted by multiple record references.[8]  When the crying interfered with the ALJ's ability to hear her testimony, the ALJ cautioned that she was hard to hear when crying and that the hearing might have to be rescheduled; the ALJ offered her the opportunity to take a "few minutes."  Tr. 52.  Plaintiff declined the offer of a break and continued to testify, and the ALJ again reminded her that she was hard to hear when she was crying.  Tr. 52-53.  When the ALJ asked about marijuana use, an appropriate question in light of the diagnosis of cannabis use disorder by at least one treating source, Tr. 525, as well as other record references to marijuana use, e.g., Tr. 549, 592, 608, Plaintiff adamantly denied ever having used marijuana ("I don't use marijuana at all") and then testified that she had lied to the several treating sources, as well as to Dr. Pittenger whose report recorded her statement to him that she had used marijuana.  Tr. 54, 56.  When Plaintiff then volunteered that she was fired after not showing up for work and telling her employer that, "I was sick, which I wasn't sick it was my depression," the ALJ asked, "So, you lied to your employer as well as your doctor?"  Tr. 59-60.  Unlike Plaintiff's admission that she lied to treating sources and during the consulting examination by Dr. Pittenger, the ALJ's decision makes no use of Plaintiff's testimony that triggered this inappropriately harsh question.

## II.   <u>Standard of Review</u>

---

[8] See, e.g., Tr. 549 (in July 2017, Plaintiff reports that her "[c]urrent activities include shopping and spending time with her boyfriend"); Tr. 552 (in August 2017, Plaintiff's mother reports that she is "walking around more with friends"); Tr. 634-35 (in November 2018, Plaintiff reports strong support system, including two close friends and boyfriend); Tr. 670 (in May 2019, Plaintiff reports "friend [who] has been visiting").

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla – that is, the evidence must do more than merely create a suspicion of the existence of a fact and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981); Brown v. Apfel, 71 F. Supp. 2d 28, 30 (D.R.I. 1999), aff'd, 230 F.3d 1347 (1st Cir. 2000) (per curiam). Once the Court concludes that the decision is supported by substantial evidence, the Commissioner must be affirmed, even if the Court would have reached a contrary result as finder of fact. Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (per curiam); see also Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991); Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128-131 (1st Cir. 1981). The determination of substantiality is based upon an evaluation of the record as a whole. Brown, 71 F. Supp. 2d at 30; see also Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied). Thus, the Court's role in reviewing the Commissioner's decision is limited. Brown, 71 F. Supp. 2d at 30. The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of the Commissioner. Id. at 30-31 (citing Colon v. Sec'y of Health & Human Servs., 877 F.2d 148, 153 (1st Cir. 1989)). "[T]he resolution of conflicts in the evidence is for the Commissioner, not the courts." Id. at 31 (citing Richardson v. Perales, 402 U.S. 389, 399 (1971)).

If the Court finds either that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim,

the Court may remand a case to the Commissioner for a rehearing under Sentence Four of 42 U.S.C. § 405(g).  Allen v. Colvin, C.A. No. 13-781L, 2015 WL 906000, at *8 (D.R.I. Mar. 3, 2015) (citing Jackson v. Chater, 99 F.3d 1086, 1097-98 (11th Cir.1996)).

## III.   Disability Determination

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 416(I); 20 C.F.R. § 416.905.  The impairment must be severe, making the claimant unable to do previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 416.905-911.  The Act provides that individuals eligible for SSI as children (under age 18) must have their disability redetermined under the disability rules for adults when they attain age 18.  42 U.S.C. § 1382c(a)(3)(H)(iii); 20 C.F.R. § 416.987.  The same rules that apply to new adult disability applications apply to an Age-18-Redetermination, except for the provisions pertaining to substantial gainful activity.  20 C.F.R. § 416.987(b); see Diane B. v. Comm'r of Soc. Sec., No. 19-CV-628S, 2021 WL 1975400, at *2 (W.D.N.Y. May 18, 2021).

### A.   The Five-Step Evaluation

The ALJ must follow five steps in evaluating a claim of disability.  See 20 C.F.R. § 416.920.  The first step, which requires examination whether the claimant is working at a substantial gainful activity, is not used for an Age-18-Redetermination.  20 C.F.R. § 416.987(b).  Second, if a claimant does not have any impairment or combination of impairments that significantly limit physical or mental ability to do basic work activities, then the claimant does not have a severe impairment and is not disabled.  20 C.F.R. § 416.920(c).  Third, if a claimant's

impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Appendix 1, the claimant is disabled.  20 C.F.R. § 416.920(d).  Fourth, if a claimant's impairments do not prevent doing past relevant work, the claimant is not disabled.  20 C.F.R. § 416.920(e)-(f).  Fifth, if a claimant's impairments (considering RFC, age, education and past work) prevent doing other work that exists in the local or national economy, a finding of disabled is warranted.  20 C.F.R. § 416.920(g).  Significantly, the claimant bears the burden of proof at Steps One through Four, but the Commissioner bears the burden at Step Five.  Sacilowski v. Saul, 959 F.3d 431, 434 (1st Cir. 2020); Wells v. Barnhart, 267 F. Supp. 2d 138, 144 (D. Mass. 2003) (five step process applies to SSI claims).

### B.    Opinion Evidence

For applications like this one, filed on or after March 27, 2017, the SSA has fundamentally changed how adjudicators assess opinion evidence.  The familiar and longstanding requirements – that adjudicators must assign "controlling weight" to a well-supported treating source's medical opinion that is consistent with other evidence, and, if controlling weight is not given, must state the specific weight that is assigned – are gone.  20 C.F.R. § 416.920c(a).  Instead, adjudicators "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from . . . medical sources."  Id.  Rather, an ALJ must consider the persuasiveness of all medical opinions in a claimant's case record.  See 20 C.F.R. § 416.920c. The most important factors to be considered when the Commissioner evaluates persuasiveness are supportability and consistency; these are usually the only factors the ALJ is required to articulate.  20 C.F.R. § 416.920c(b)(2); Jones v. Berryhill, 392 F. Supp. 3d 831, 839 (M.D. Tenn. 2019); Gorham v. Saul, Case No. 18-cv-853-SM, 2019 WL 3562689, at *5 (D.N.H. Aug. 6,

2019).  Supportability "includes an assessment of the supporting objective medical evidence and other medical evidence, and how consistent the medical opinion or . . . medical finding[] is with other evidence in the claim."  Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5859 (Jan. 18, 2017).  Other factors that are weighed in light of all of the evidence in the record includes the medical source's relationship with the claimant and specialization, as well as "other factors" that tend to support or contradict the medical opinion or finding.  See 20 C.F.R. § 416.920c(c)(1)-(5); Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. at 5859.  "A medical opinion without supporting evidence, or one that is inconsistent with evidence from other sources, [is] not . . . persuasive regardless of who made the medical opinion."  Id. at 5854.

> **D.    Evaluation of Claims of Mental Impairment**

The evaluation of a claim of disability based on mental illness requires use of a psychiatric review technique ("PRT") that assesses impairment in four work-related broad functional areas: (1) understanding, remembering or applying information; (2) interacting with others; (3) concentration, persistence or maintaining pace; and (4) adapting or managing oneself. 20 C.F.R. § 416.920a(c)(3).  The ALJ uses a five-point rating scale: none, mild, moderate, marked, and extreme.  20 C.F.R. § 416.920a(c)(4).  If the impairment causes no or "mild" difficulties in these areas, the ALJ generally will find that it is not severe.  20 C.F.R. § 416.920a(d)(1).  However, for an individual diagnosed, for example, with depressive disorder as described in Listing 12.04, anxiety disorder as described in Listing 12.06 or personality/impulse control disorder as described in Listing 12.08, if the diagnosed impairment causes marked limitations in at least two of the broad functional areas, or extreme limitations in at least one of the broad functional areas, the ALJ will find that the "paragraph B criteria" necessary to establish

those Listings are equaled or met.  20 C.F.R. Pt. 404, Subpt. P, App. 1, Part 2, § 12.00(A)(2)(b)

("To satisfy the paragraph B criteria, your mental disorder must result in 'extreme' limitation of

one, or 'marked' limitation of two, of the four areas of mental functioning.").

 The PRT is used to rate the severity of mental impairments at Steps Two and Three of the

sequential evaluation process and, if found to be severe, also serves as the backdrop for the more

detailed mental RFC assessment at Step Four.  See, e.g., Wells v. Colvin, 727 F.3d 1061, 1069

(10th Cir. 2013); SSR 96-8p, 1996 WL 374184 (July 2, 1996).  The ALJ must incorporate

pertinent findings and conclusions based on the PRT into his decision and must include a

specific finding as to the degree of limitation in each of the four functional areas.  20 C.F.R. §

416.920a(e)(4); Carolyn Kubitschek & Jon Dubin, Social Security Disability Law & Procedure

in Federal Court § 5:38 (2021 ed.).

 **F.**   **Credibility of Claimant's Subjective Statements**

 Where an ALJ decides not to fully credit a claimant's subjective statements, the ALJ

must articulate specific and adequate reasons for doing so, or the record must be obvious as to

the credibility finding.  Rohrberg v. Apfel, 26 F. Supp. 2d 303, 309 (D. Mass. 1988).  A

reviewing court will not disturb a clearly articulated credibility finding with substantial

supporting evidence in the record.  See Frustaglia, 829 F.2d at 195; see Cruz v. Astrue, C.A. No.

11-638M, 2013 WL 795063, at *16 (D.R.I. Feb. 12, 2013), adopted, 2013 WL 802986 (D.R.I.

Mar. 4, 2013) ("In critiquing the ALJ's credibility determination, this Court is mindful of the

need to tread softly, because [i]t is the responsibility of the [Commissioner] to determine issues

of credibility and to draw inferences from the record evidence.") (internal quotation marks

omitted).  However, in the absence of evidence that directly rebuts the claimant's testimony or

presents some other reason to question its credibility, the ALJ must take the claimant's

statements as true.  Sacilowski, 959 F.3d at 441.

**IV.    Analysis**

> **A.     The ALJ's Mental Health Determinations**

The ALJ's mental PRT and RFC findings are drawn from the administrative findings of

Dr. Clifford Gordon, an expert non-examining state agency psychologist, whom the ALJ found

to be "persuasive."  Tr. 26 (referencing Tr. 614).  In turn, Dr. Gordon's findings are based on his

review of the evidence and his endorsement of the PRT/RFC findings of Dr. Albert Hamel, who

opined that Plaintiff's functioning had somewhat stabilized, but that she still was moderately

limited in her ability to interact with others and to concentrate, persist or maintain pace.  Tr. 94-

97.  In reaching this conclusion, Dr. Hamel interpreted and expressly relied on the consulting

examination report prepared by Dr. Pittenger; Plaintiff's "relatively long history of mental health

difficulties and treatment," including two hospital admissions at Bradley Hospital; and Plaintiff's

"relative improvement and stability" since the last admission, including her treating records at

Santiago Medical Group, Wellness RI, Bradley Hospital, Hasbro Hospital.  Tr. 94-97.  In

addition to her reliance on these mental health experts, the ALJ herself accurately surveyed the

evidence, considering Plaintiff's subjective testimony, "Function Report findings," and her daily

activities, as well as the objective clinical findings of treating sources and the objective

observations of the examining psychologist on mental status examination.  The ALJ noted the

absence of any mental health treating source who recommended restrictions from working,[9]

coupled with the recommendation for continuing conservative treatment.  Tr. 25-26.

---

[9] The only recommended restriction was that Plaintiff refrain from going to the gym for the sole purpose of losing weight.  E.g., 536.

Importantly, for both the period in issue and the period preceding it, there is no evidence of any medical professional opining to greater functional limitations beyond those found by the ALJ.

Plaintiff's principal argument – that the ALJ improperly "strictly limited" her review to evidence after January 2018 – is simply unfounded.  ECF No. 12-1 at 9.  As the Commissioner correctly points out, the ALJ's decision specifically references Plaintiff's longitudinal medical history and that "treatment notes prior to the alleged onset date establish a medical history significant for problems with an eating disorder, depression and anxiety developed at age 13." Tr. 23.  More significantly, the ALJ's Step Two, Step Three and RFC findings all rely on the expert findings of the non-examining psychologists and of Dr. Pittenger, the examining psychologist, all of whom expressly reviewed and considered evidence and information from 2016, 2017 and 2018.  Further, Plaintiff does not suggest that there is any breach of the ALJ's duty to develop the record by gathering materials covering both the period in issue as well as the period prior.[10]  20 C.F. R. § 416.912(b)(1).  While the ALJ did not specifically discuss the pre-January 2018 evidence in the same detail that she devoted to the evidence from the period in issue,[11] that is not error nor does it establish a breach of the ALJ's duty to consider "all relevant and available clinical signs and laboratory findings," as required by 20 C.F.R. § 416.920a(c)(1).  See Santiago v. Sec'y of Health & Hum. Servs., 46 F.3d 1114, 1995 WL 30568, at *4 (1st Cir. 1995) (per curiam) ("ALJ was not required to recite every piece of evidence" as long as

---

[10] Normally, this is the twelve-month period preceding the application.  20 C.F.R. § 416.912(b)(1).  For an Age-18-Redetermination, there is no application.  Rather, Plaintiff's redetermination was automatically initiated at her 18th birthday, with fact-gathering during the initial phase, following which the Commissioner found that she had ceased to be disabled on January 22, 2018.  In developing the record in connection with this case, evidence was assembled for a period beginning in early 2014.

[11] The relevant period in issue is from the cessation date – January 22, 2018 – until the date of the ALJ's decision.  Reid v. Comm'r of Soc. Sec. Admin., Civil Action No. 19-00742-BAJ-SDJ, 2021 WL 1227872, at *3 n.4 (M.D. La. Mar. 31, 2021).

"decision reveals that he considered the record as a whole, and that he considered the combined impact of appellant's impairments"); Rodriguez v. Saul, No. 19-CV-10002 (JGK) (OTW), 2021 WL 1845063, at *2 (S.D.N.Y. Mar. 2, 2021), adopted sub nom. Rodriguez v. Comm'r of Soc. Sec., 2021 WL 1335907 (S.D.N.Y. Apr. 9, 2021) (in Age-18-Redetermination claim, appropriate to focus on "records after Plaintiff turned eighteen, and the relevant period after . . . the date at which the SSA concluded that Plaintiff was no longer disabled").

   With the exceptions addressed below, the balance of Plaintiff's challenge to the ALJ's decision – at Step Two,[12] Step Three[13] and the RFC – is largely based on inaccuracies and, at bottom, amounts to a request that the Court reweigh the evidence and come to a different conclusion.  To take just two examples, Plaintiff argues that the ALJ cherrypicked the evidence by failing even to mention Plaintiff's Function Report and Plaintiff's new prescription from Nurse Kaufman for "newly diagnosed Panic Disorder."  ECF No. 12-1 at 10.  As to the former contention, it is just wrong – Plaintiff's Function Report is expressly discussed in the ALJ's decision.  Tr. 20.  As to the latter, the record Plaintiff cites (from February 19, 2019) does not reflect a new diagnosis of Panic Disorder, but rather only Plaintiff's claim that she was having daily panic attacks; it does not reflect an increase in medication, but rather reflects the substitution of a new medication (prescribed to ramp-up to efficacious levels) for two

---

[12] An aside regarding Plaintiff's Step Two arguments – she attacks the ALJ's failure to add self-injurious behavior, obsessive compulsive disorder and panic disorder.  ECF No. 12-1 at 8.  This argument fails not only because it is made in passing and completely undeveloped, but also because the diagnoses Plaintiff contends are erroneously omitted are included in the Listings as symptoms of anxiety disorder, which the ALJ found to be severe.  20 C.F.R. Pt. 404, Subpt. P, App. 1, Part A2, § 12(B)(5) (anxiety and obsessive-compulsive disorders dealt with in Listing 12.06, which is established by symptoms such as panic attacks, obsessions and compulsions).

[13] Plaintiff's attack on the ALJ's Step Three analysis is limited to the undeveloped argument that it amounts to an erroneous lay interpretation of the evidence.  In fact, the ALJ drew her Step Three findings from the PRT opinion of Dr. Hamel, as endorsed by Dr. Gordon, and made detailed PRT findings and conclusions as required by the applicable regulations.  20 C.F.R. § 416.920a(e)(4).  There is no error.

discontinued medications.  Tr. 674-75.  More importantly, this record is entirely consistent with

and supportive of the ALJ's decision in that it reflects Nurse Kaufman's clinical observation – an

entirely normal MSE.  Tr. 675.  Finally, Plaintiff's argument that ALJ ignored this record is

wrong.  To the contrary, the ALJ expressly cited the exhibit of which this record is a part to

support her finding that Plaintiff's MSEs during the period in issue were largely normal.  Tr. 21,

25.  Moreover, just two and a half months later, Plaintiff was examined by her provider team at

Lifespan's Hasbro Hospital (Dr. Christine Andrews, with input from Plaintiff's longtime

provider, Dr. Donaldson).  This record reflects observations of "mood and affect appropriate."

Tr. 701.  Far from opining that she is disabled, these providers – one of whom had cared for

Plaintiff since 2014 – noted in their "[a]ssessment and [p]lan" that "[s]he is about to start work,

which may help."  Tr. 701.

        In short, the record Plaintiff complains the ALJ ignored was not ignored but was

considered and is entirely consistent with and supportive of the ALJ's findings.  The Court has

examined each record Plaintiff points to in support of her cherry-picking argument – none

permits the conclusion that the argument has merit.

        What remains is Plaintiff's contention that the ALJ improperly interpreted raw medical

data.  Much of this argument just makes no sense.  However, one aspect requires the Court's

careful review.  That is, in this case, as in virtually all disability cases, the non-examining experts

provided their administrative findings over a year before the ALJ issued her decision, and during

that fourteen-month period, Plaintiff's medical treatment continued.  In such a circumstance, it is

well settled that an ALJ may review the post-file review evidence and rely on common-sense to

conclude that it fails to establish worsening, as well as that the pre- and post-review records are

similar so there is no need for an additional medical expert.  Jennifer F. v. Saul, No. C.A. No. 19-

547MSM, 2020 WL 6488706, at *6 (D.R.I. Sept. 16, 2020), adopted, 2020 WL 6487813 (D.R.I.

Nov. 4, 2020) (when "ALJ carefully reviews the post-file review evidence and makes the

common-sense observation that the pre-and post-review records are similar, that ALJ may rely

on the opinions developed through the file review process"); Michele S. v. Saul, C.A. No. 19-

65WES, 2019 WL 6242655, *8 (D.R.I. Nov. 22, 2019) (if "requisite worsening" missing from

post-file review record, ALJ may rely on state agency opinions); Sanford v. Astrue, No. CA 07-

183 M, 2009 WL 866845, at *8 (D.R.I. Mar. 30, 2009) (no need for medical expert if post-file

review records similar to those seen by non-examining expert).  Indeed, to render an SSA

opinion irrelevant merely because the expert was not privy to updated medical records "would

defy logic and be a formula for paralysis."  Id. at *8 (citing Kendrick v. Shalala, 998 F.2d 455,

456–57 (7th Cir. 1993)).

        Consistent with this legal principle, the ALJ performed a careful (and accurate) survey of

the post-file review record and made the following finding:

> The subsequent evidence is consistent with the evidence reviewed by these
> sources in that the claimant remained psychologically intact with only modest
> findings on mental status examination.  There was no indication that the
> claimant's condition substantially worsened or that a new condition developed
> that would substantially alter the pertinent findings.

Tr. 26.  The Court's review of the post-file review record confirms that this finding is well

supported by substantial evidence.  This case is very different from those in which remand is

ordered because "'the state-agency physicians were not privy to parts of [plaintiff's] medical

record [which] detracts from the weight that can be afforded their opinions.'"  Ruben M. v. Saul,

C.A. No. 19-119MSM, 2020 WL 39037, at *9 (D.R.I. Jan. 3, 2020), adopted, 2020 WL 555186

(D.R.I. Feb. 4, 2020) (quoting Virgen C. v. Berryhill, C.A. No. 16-480 WES, 2018 WL 4693954,

at *3 (D.R.I. Sept. 30, 2018) (alterations in original)).  The ALJ's treatment of the post-file review record was entirely appropriate in light of this settled law.

### B.      The ALJ's Credibility Determination

The Court need not linger long on the ALJ's well-supported determination that Plaintiff's subjective statements about her symptoms should be discounted.  For example, Plaintiff's testimony that she has no friends and is confined to her room by anxiety and depression, with only her mother to care for her, is directly rebutted by the substantial evidence throughout the record of Plaintiff's "social activities," as the ALJ found.  Tr. 23; <u>see, e.g.</u>, Tr. 552 (going "to Six Flags and walk[ing] around"); Tr. 549 ("spending time with her boyfriend"); Tr. 669 ("friend [who] has been visiting").  Nor did the ALJ err in relying on Plaintiff's untrue claim that she was so limited by her impairments that her mother had stopped working to care for her.  <u>See</u> Tr. 25. Nor did the ALJ err in relying on Plaintiff's testimony that she lied to various treating sources and to Dr. Pittenger, as support for the finding that the information she provided to various sources "may not be entirely reliable."  Tr. 25.  While there is no question that "nefarious impugning of Plaintiff's character" has no place in an ALJ's Social Security analysis, that is not what happened in this case.  <u>Rhonda F. v. Saul</u>, No. C.A. No. 19-401JJM, 2020 WL 3470503, at *12 (D.R.I. June 25, 2020).

### C.      The Fairness of the ALJ's Hearing

Plaintiff's final challenge derives from some of the ALJ's questions and statements during the hearing in light of Plaintiff's potential vulnerability as an emotionally fragile *pro se* claimant of low average intelligence who was only nineteen years old.[14]  In considering this

---

[14] Plaintiff's related contention that the ALJ erred in relying on the gaps in treatment is not well founded.  The ALJ's focus was properly on the substantially supported fact that there are no mental health-based hospitalizations or significant emergency treatment during the pertinent period, Tr. 21, as well as on the many times when Plaintiff had established treatment with well-qualified providers, such as those at Wellness RI, but simply did not appear for

argument, the Court has carefully reviewed the transcripts of both hearings and finds that the ALJ handled the hearings professionally and appropriately, including questioning Plaintiff about her medical treatment and prior employment during the first hearing to be sure the record was complete, educating Plaintiff to assist her in getting an attorney, and offering Plaintiff the option of a pause or a continuance when Plaintiff became incoherent from crying. Plaintiff does not argue, nor could she, that the ALJ's conduct at the hearing was so truncated as to result in material evidence that was not procured as in Torres-Pagan v. Berryhill, 899 F.3d 54, 60 (1st Cir. 2018). To the contrary, the ALJ used the first hearing to courteously question Plaintiff to be sure the record was complete. Tr. 66-67. Further, the clear language that the ALJ used to ask Plaintiff to clarify whether she really had just testified to lying to treating sources ("So you lied to your doctors?") appears to the Court to be appropriate given the importance of procuring an unambiguous answer to such an important question – this was not the moment for a euphemistic question that a Plaintiff might misunderstand. Tr. 56.

The only point where the ALJ arguably deviated from conducting this hearing fairly, patiently, professionally, and appropriately was her judgmental question ("So, you lied to your employer as well as your doctor?") asked in response to Plaintiff's testimony that she told her employer that she "was sick, which I wasn't sick it was my depression telling me that I should tell him was – my manager I was sick." Tr. 59-60. Mindful that the ALJ's decision makes no use of this portion of the testimony, I find that this interchange is an isolated lapse that does not approach the level of fundamental unfairness required for remand. See Grady v. Astrue, 894 F. Supp. 2d 131, 143-44 (D. Mass. 2012) (ALJ's interruptions, comments and brusque tone might have been discourteous or intimidating but are insufficient to support conclusion that process

---

appointments. See Tr. 24 (referencing Tr. 589, 662, 697). The decision does not reflect that the ALJ was relying on the lapses in treatment that Plaintiff attributes to insurance problems. E.g., Tr. 636.

lacked fundamental fairness or that ALJ acted with such high degree of antagonism so as to require remand).

V.    **Conclusion**

Based on the foregoing, I find that the ALJ made no error of law and that her decision is well supported by substantial evidence.  Therefore, I recommend that Plaintiff's Motion for Reversal and Remand (ECF No. 12) be DENIED and that Defendant's Motion to Affirm the Commissioner's Decision (ECF No. 15) be GRANTED.

Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days of its receipt.  See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision. See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
November 1, 2021